The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Be seated please. Next case we'll hear this morning is United States v. Umeti and Ms. Thomas I guess we'll hear from you first. Good morning, Your Honors, and may it please the Court. Jenny Toma for Ebuka Umeti. I'd like to begin with the jury selection issue. The District Court erred in three ways in denying Mr. Umeti's motion for a new trial based on the statements made by Mr. Kodesh during the jury selection about his personal knowledge of the crimes and the defendants at issue in the case. The first reason is because the jury heard extraneous information, information that occurred outside the trial in the case. The District Court was therefore obligated to address it and to investigate its impact on the jury and to find out whether or not it was prejudicial. But the District Court did not address it at all. He didn't do anything, took no curative measures, and that was the first error. Why would the Court think that these are comments by Mr. Kodesh? Why would anyone think they were prejudicial? He stated that he was familiar with the defendants who were on trial and the crimes in that case because he'd taken part in some of the remediation measures as a cybersecurity expert, so he had worked on the remediation of these crimes. We might have done some of the remediation, and I've heard of the defendants and some of their previous involvement in this industry. How does that indicate any knowledge or thought of guilt or actions? Well, if he's working on the crimes that occurred, if he's worked on them, then he's aware of the defendants as people who perpetrate these schemes. I think it's a very easy connection to make, and it's one that certainly I would have if I were seated on that jury or on the veneer. I think that's a very, very prejudicial and presumptive, it's a prejudicial thing to say. Even if he says, I know the defendants, he doesn't express any judgment one way or the other about it. I think if he had only said, I need to be recused because I worked on these crimes that occurred, I don't think we'd be taking the same position. The problem is that he connected it to the defendants, these defendants. Connected what? The business email compromise schemes that were actually at issue. He said the industry connected them to the industry, didn't he? Yeah, I believe he's referring to the industry of committing illegal business email compromises. That's your take on this. There's nothing in the record that says that. They certainly weren't employed legitimately in the industry or anything like that. I don't think there's any other inference you could draw from a statement like that with this case. They could have been helping remediate. I don't believe the jury heard any evidence to that effect. Well, this is the second question in the voir dire, and the jury knows almost nothing, and they are asked many questions thereafter whether they can render their verdicts based on the evidence. That's true. And they hear the evidence. I would point the court to a couple of things with regard to that. I mean, in a different case, in a different scenario, that might not be an issue that I would press, but here I think it's particularly important for two reasons. The first is that asking, these are laypersons who are seated in the jury pool. These are not, you know, you or I who understand the difference between what we're hearing during jury selection versus what's occurring in the same courtroom immediately afterwards in a trial, right? And so these folks are relying on the judge to let them know if and when they hear something that's inappropriate or that they shouldn't take any inference from. They're not experts in any way. And so it's important, particularly important in this case, I think, for the judge to have noted something, like in Olacienda, which the government raised and which we also cite in our flag brief as well, to say, listen, just so you understand what the trial hasn't started and what you just heard wasn't evidence and you aren't to consider it. It's important for laypersons to understand that, and they got no guidance. And the second thing is, with regard to the instructions, I point the court to JA-76, where some of these instructions the court was giving were not, didn't make any distinction between those two things. At JA-76, he tells, or she, excuse me, she tells the jury to base decisions, quote, on what you see and hear in the courtroom. Well, what they saw and heard during jury selection was indeed in the courtroom, and there was absolutely no distinction made in some of these instructions. And so I think there's a real danger of a misunderstanding by laypersons who aren't familiar with the difference between jury selection and trial and evidence that they're hearing at trial. I think there's a real danger of confusion. So for that reason, we do think it was important. And I would point the court specifically to Haley, which is a case that we cite and rely on as well. In that case, there was someone who did the same thing, who said, I have personal knowledge of what's going on in this case, and the defendants really did do what they're being accused of doing. I think that's the closest on-point case for what was said. What stage of the case was that said? It was said during deliberations, if I recall correctly. And so if the court is drawing a distinction about when, is more concerned about when it occurred, then I think Olacienda is instructive in that case, because it was that concerned a potential juror who said that she believed, if any defendant had made it that far, i.e. to trial, that they were probably guilty. And in that case, she wasn't even saying anything about personal knowledge. She was just stating a personal philosophy about, she believed defendants who got to a certain stage of proceedings were probably guilty. And in that case, the district court immediately stepped in, and he admonished her, and he told the entire veneer, this is not what you are to, this is, first of all, not the correct standard to decide the case. And he corrected them and told them what it was. And so I think either way, if you're focused on what was said, Haley supports us. If you're focused on when it's said, Olacienda supports us, in that the district court should have at least made sure that the jury understand that what they heard wasn't evidence, and it wasn't supposed to be considered. So if the court has further questions about that issue, I'm happy to address them. But then I, if not, I'll then move to the loss issue, which I'd like to address next. Okay. The statutory maximum of Mr. Umedi's count 11 sentence was erroneously doubled because the government did not produce evidence that there was at least $5,000 in loss as defined by 1030E11 of the Computer Fraud and Abuse Act, or the CFAA. First, the government didn't. He got, if I'm remembering correctly, one additional year to serve because of this fine. That's correct. It was doubled from one to two years. So if we agree with you, he would have to be resentenced. Correct. Okay. The government didn't elicit any evidence that the jury could have used to total up an amount and reach $5,000 in response costs. But I don't read that definition to mean only response costs. I read loss to be an English word that's pretty easy to understand and that the addition of response costs is to make clear that the loss includes not only the actual loss from the crime but the response costs because it says basically including response costs. And in this case, there was evidence of $5,000 worth of loss wasn't there? The amount of money that was taken from the differential between the amount of money that was taken and the amount of money that was recovered exceeded $5,000. I would have to respectfully disagree with that for a couple of reasons. The first reason is that, and I'm glad Your Honor brought that up because I also needed to point out that initially Mr. Umedi's original trial counsel withdrew at the appeal stage and he unfortunately neglected to put something very relevant to the loss question in the record. And so we had filed a motion to include an addendum to the brief with that information. There's a search warrant that was filed in district court that's under seal in district court that states at footnotes, this is in the addendum pages 5 and 6 at notes 6 and 8. In the search warrant application where Agent Kim tells the district court that both companies got their money back Let me ask you this, set that aside, I'm talking about the record. Tell me what the numbers are. I thought there was quite a differential between the amount stolen or embezzled or obtained and the amount recovered. I thought both those numbers were in the record. We addressed that in the reply brief. Wasn't it over a million dollars or something, the differential? 1.1 or 1.7 million? There was some, the government relies on one witness testimony saying about 1.7 million dollars. And as we spent some time in the reply brief explaining, the actual amount is 1.2. And everyone in this case has always understood that. Okay, but that's irrelevant to the $5,000 figure. That's irrelevant. It doesn't make a difference with respect, that's clearly over $5,000. And the loss is the differential between what you people, it's what the victim lost and the victim lost X dollars less what they recovered. And that loss, the number, is I think way larger than 5,000 in the record. I wish I had the numbers at hand, but I did see the numbers in preparing. And I'd love to have those numbers. It's the difference between 1.7, which was the testimony of one of the witnesses, and 1.2, which is what all involved, including the government, have always understood to be the actual loss amount in this case. All right. A million dollars? The indictment said 1.2. Okay. That's 500,000, right? That is. And 500,000 is ten times the amount. We would also point the court to the fact that these, again, I'll point the court to Fisher, which we cite in the briefs, which is a Supreme Court case that explains that even when you have language like this, a general clause that says any reasonable cost, which is what we have here, anytime you have a general clause that's followed by a more specific clause. I know that interpretation. But in this case, when you're measuring the crime by the amount of loss, which includes the response, clearly the crime, the essence to the crime is somebody stole something, and it's more severe if you have a large loss. And to have the inclusion of response costs, which might not otherwise be obvious. I mean, I know the exclusio unius, you know, the Latin phrase, interpretation, but you have to use these things with a certain amount of common sense, too. We don't go with formulas and end up with absurd results. I would point the court to a quote from Fisher that says, even if it's literally covered by the language, the inclusion of specific examples afterward means that we are to draw the meaning from those specific examples. Well, wouldn't that be limited to the cost of remediation in that part? But the statute goes on to say any revenue lost, which would seem to be self-evident in a separate category from cost of remediation. The question goes to the last part of the statute. So any revenue lost, cost incurred, consequential damages incurred because of interruption of service. So it appears to limit what can be considered to those costs or loss that come about because of interruption of service. That's right. So did you make an argument anywhere that the interruption of service was not present here? That has never been at issue because there was no interruption of service. Well, did you argue that? I believe that we did, but I'm happy to find a page for your argument. Well, that might be pretty crucial because that's the language of this particular statute. And if you didn't argue it, then I'm not sure we get to it. There was no interruption of service in this case. Well, that might be your opinion. What I want to know is where did this come up in the district court and where did you argue it? I'll look at that for your honor. But, yes, our position is, of course, that that second prong has never been at issue because there was no interruption of service. Now, in terms of the amount that was freezed and recouped, there's a difference, of course, between the response costs. There was testimony about response costs. The problem is that the government failed to actually elicit any amounts. Some of the things that were testified to simply weren't losses as defined by the statute, like contacting customers, that's not really an identifiable cost. However, some of the things that were qualifying, such as buying a new laptop or new software, could be qualifying costs, but there was no amounts elicited. There was no amounts saying how much those cost, that they didn't ask the witnesses about. There also wasn't any information about why those things were technically reasonable, and that is a requirement. There does have to be a demonstration of reasonableness for those costs. It could be that they were. It could be that maybe those were purchases that weren't necessarily needed under the circumstances, but we don't know because they just weren't asked. The witnesses weren't asked specific questions about it. So I see that I'm approaching the end of my time. You've got some rebuttal, too. I do. I do. I'll reserve all 45 seconds for rebuttal if the court will. Thank you. All right. Thank you. Ms. Withers. Good morning, and may it please the court. My name is Laura Withers, and I represent the United States of America. Could you start with the loss issue? You can go back to any issue, but I'd be just interested in hearing what your take is on that. Absolutely, Your Honor. It's the government's position that the jury could reasonably have concluded that the defendant's scheme caused at least $5,000 in loss under any definition under either of the two independent BCs that are before you today. This is a sufficiency of the evidence question, and so the defendant's burden here is high. I agree with you, Judge Niemeyer, that loss under 18 United States Code Section 1030E11 includes any reasonable cost to any victim and then is followed with an illustrative list that is not exhaustive. On its face, as this court held in A.V. X. Relvanderhine v. I. Paradigm's LLC, the statutory definition of loss is, quote, broadly worded, encompassing any reasonable cost to any victim. In this case, I would note that in addition to the testimony that was before the jury from the CPP representative about $1.5 million of funds that were disbursed. 1.7. 1.7, I apologize. There was additional evidence in the record at JA 1225 to 1226, about $850,000 specifically with respect to their vendor, Rolls-Royce, and about $140,000 at JA 297 for their vendor, Benchmark. And so in addition to testimony. What's a vendor, Benchmark? Oh, I'm sorry. Their vendor, the Benchmark company. So the way. That's the name of the company? That's correct, Your Honor. And what was that for? That was money that was supposed to be remitted that was sent to an account controlled by the co-conspirators in this case. And so the jury didn't just have to take the word of the CPP company representative. They also had figures. Did you cite those in your brief as opposed to the $1.7 million cite on 287? Yes, Your Honor. I believe that we cited both to the fact that the CPP representative testified to $1.7 and then by the time we got to sentencing and restitution, the amount that CPP was seeking was about $1.2 million. And that included, this was a case where the defendants were prolific. And so at trial we picked and chose what victims we focused on. We focused on Rolls-Royce and Benchmark because they had the highest amounts, but CPP had other affected customers. And so that is how we got to the $1.2 million in loss. And to your point, Judge Niemeyer, stepping back. What were the categories? What were the items making up the $1.2? That amount was the actual stolen funds in this case. And was there any other type of cost or loss shown? Yes, Your Honor. And to this question about the reasonableness, the jury certainly could have concluded based on the CPP representative's testimony about the remediation process that that amount reasonably came to more than $5,000. But they never put $1. Somebody needed to ask one more question to get $1. I don't disagree with you, Judge Agee. However, a reasonable jury could certainly have concluded that when the CPP representative testified that they had to get new software, two new laptops, they got a whole employee from the corporate office to contact every single customer, that's absolutely remediation to make sure that they've contacted every single customer. She said they had to talk to them physically or on the phone. They couldn't send an email because they didn't trust their email. That it took three months. The jury certainly could have concluded that that was over $5,000. Well, if the statute stopped for a period after revenue lost, then I think you'd have a pretty strong argument that the testimony about the 1.7 or the 1.2 or the other numbers satisfied that. But then it goes on to say revenue loss because of interruption of service qualifies that. Why is this a loss caused by interruption of service? It's not our position that it is, Your Honor. It's our position that it falls under that first prong. A reasonable cost to any victim, including the cost of responding, but not exclusive to the cost of responding to any offense, conducting a damage assessment, restoring data and program. And I would note that from a practical point of view. Do I make sure I understand? You're saying the interruption of service limitation is just on the revenue lost part? In reading the cases, that appears consistent with the way that courts have interpreted the difference between the two prongs. And we've always argued that the $5,000 is a reasonable cost to any victim under the first prong of 1030E11. And this is what I had to pay some guy to fix what got messed up? It's our position that that's not exclusively the option before this court. Again, it's an inclusive list. So as I believe Judge Niemeyer noted, you know, responding to an offense, conducting a damage assessment may be a less obvious category of loss, and therefore it's appropriate to enumerate that to make sure that everyone understands what Congress is talking about. But we believe that the stolen funds do fall under that provision. But even if the court wants to rule on the more narrow terms, we think that the remediation testimony from the CPP representative was certainly sufficient for a jury to conclude that there was a loss over $5,000. Well, I'm just slow this morning, so bear with me. Are you arguing that the revenue lost, we'll call it $1.2 million, had to be lost because of an interruption of service? No, Your Honor. All right. If we disagree with you, we didn't write the statute, Congress wrote the statute, that there has to be proof of interruption of service, then what does that do to your argument? Then I would point the court to the remediation piece, which is separate and apart. That was separate and apart from the $1.2 or $1.7 million. I understand that. And so that would be the cost of responding to any offense, conducting a damage assessment, restoring data, a program, a system, or information to its condition prior to the offense. And it's certainly new software, multiple laptops, an employee devoted to this for three months, contacting every customer personally on the phone, not just, you know, copy pasting in an e-mail. The jury certainly could have concluded that that caused a loss, a reasonable loss. If it was to the $1.2 million, that plug figure for revenue loss, you agree that there was no argument or evidence presented that that loss was caused by an interruption of service, whatever that is? That's correct, Your Honor. Okay. Okay. I'd like to move on to the juror issue if there are no other questions on the loss. Let me just go back to follow this. I think this is a fairly difficult issue. It's not a slam dunk for you by any means. And the definition says the term loss means any reasonable cost to any victim, comma, including, is the number you're using, the $1.7 million, a cost to any victim? Yes, Your Honor. I think $1.2 would be the safer number here because that was the actual. Okay, $1.2. I don't care about the number. Yes. Yes. And why is that a cost to a victim? Because it is something that they are out of pocket as a direct result of the defendant's conduct in this case. I want to point to a practicality here, too. Hypothetically. While you're doing that, I mean, how is that any? Yes. What's the difference then between a cost and revenue loss then as to this $1.2 million? Revenue lost as a result of an interruption of service would be, you know, your system goes down. And, you know, you are losing $30,000 a day while your system is down. That is a different type of lost revenue from I hack your computer and I steal $1 million from you. It's a different type of harm affected in a different way, but nonetheless it hurts the victim. It's a loss and a cost. Correct, Your Honor. And I would just note to that hypothetical of I hack into your computer and I steal $1 million, in sentencing my guidelines are very high based on that loss amount. It doesn't really make sense as a practical matter that my sentence would nonetheless be capped at one year if I steal $1 million. And so thinking at it from the perspective of what Congress is seeking to accomplish here, it's clearly to tie potential punishment to the size of the harm. And so it wouldn't make sense to have a situation where hundreds of thousands, millions of dollars are stolen from a victim and someone's potential sentence is capped at one year. But, again, we do believe that this court could rule under either piece of this, finding that the $1.2 million is a reasonable cost to the victim and or that the jury could have found a reasonable loss over $5,000 based on the testimony about remediation. Do you find a difference or do you think there's a difference between the word loss and cost? No, Your Honor, I don't. I think it is a cost to a victim. It's basically what you would say on a tally sheet, right? I would think a cost is something you pay to have something. Whereas a loss, you did nothing. You just lost it because of the theft. But I think there may be a difference between a loss and a cost. I think that certainly if you're looking at a tally sheet of, you know, revenue coming in and revenue going out every month, you know, it would be a cost to the victim if you're out, you know, $1.2 million. But, again, we think you could rule under either piece of the argument. Do you think this enhancement is limited to cost as opposed to a loss? No, Your Honor. I mean, 1030C4, big A, little I, 1, has the enhancement as loss to one or more persons during any one-year period. And then as part of defining loss, it says any reasonable cost. And so I do think that those two thoughts are bound up together, that we're looking at a loss. We're looking at a reasonable cost to a victim of a particular scheme. I would like to briefly touch on the veneer issue, if I may. I do think that o lasienda is the right framework here from both a factual and a legal perspective, and that's this Court's case from 1997. In both cases, Judge Brinkema brings in the jury veneer. They're sworn before the process begins. She's asking questions to get at potential prejudices. Judge Agee, as I believe you pointed out, the answer that is given here is fairly vague. It's not specific to this case. And at the end of the process, Judge Brinkema asks, is there any reason that you, the jury veneer under oath, cannot be fair and impartial? No one responds. She asks defense trial counsel if he would like to have her ask any further questions. He doesn't have any questions that he wants about this particular juror issue. And so as in o lasienda, Judge Brinkema strikes that juror, and she swears in a presumptively impartial jury that will follow her instructions. I do disagree with opposing counsel on the idea that the jury was not instructed about, for example, what evidence is. They were told what evidence is. They were told that the statements of the parties are not evidence. It was made clear in the instructions that, you know, what they were and were not to consider as part of their deliberations. And so as in o lasienda, the defense bore a very heavy burden here in attempting to strike the entire veneer. As in o lasienda, Judge Brinkema properly questioned and instructed the prospective jurors. She made the decision not to draw additional attention to the veneer person's answer by asking further questions. She asked the defense in this case if they wanted additional questions. They didn't. And so she, as in o lasienda, this court should determine that Judge Brinkema acted squarely within her discretion when she was dealing with the question before her. And just to distinguish this situation from the kind of rimmer line of cases that opposing counsel has relied on, I agree that there seems to be something in these cases different about voir dire. I have yet to find a case where the rimmer line of cases was applied to voir dire. Even the Johnson case that the defense cites is not a voir dire case. And that seems to be speaking to the fact that, you know, here we have a situation where the juror is responding to a direct question from the judge. This is not an unauthorized or an extrajudicial communication. It's in court. It's on the record. Therefore, it's not private. And it's with all the parties present and, therefore, with the full knowledge of the parties. That allows Judge Brinkema to make an independent determination about what was said and whether there was prejudice from that. It gives the defense the opportunity that he was given and declined in this case to ask for clarifying questions with respect to the effect on the rest of the veneer. And it means that there's an opportunity to address whether or not prejudice arose. Here the defendant has not met his burden to establish that there was, that this rose to the level of a presumption of prejudice where any kind of hearing was required. And as in Olacienda, Judge Brinkema did not abuse her discretion in the way that she handled it. I'm happy to deal with, to answer any of the questions about the voir dire issue or if there are any other questions about the sufficiency itself separate from the loss. But otherwise. I must say, as I'm thinking about it, I'm still thinking about this question of loss and cost. And I'm wondering whether Congress was focused more on damages caused, in a sense of what its cost to rectify and reassert itself as opposed to just loss. It may be one and the same, and I really have to think about that. But your argument is helpful. Thank you very much. Thank you. We'll hear now from Ms. Thomas-Tama. Thank you, Your Honor. All right, I'd like to start first by, I think if I understood opposing counsel correctly, and please correct me if I'm wrong, but I believe there's no dispute that any of this falls under prong to under the interruption of service. Yeah, I think that has always been the position. Of course, I was not trial counsel. But my understanding of the record is that that was never argued by the government below. It's not argued by them here today. And our briefs referred only to, quote, prong one losses, because those were the only kinds of losses that Mr. Emetti was alleged to have caused. So just to round that out. The second thing that I would say is that, to be very clear, no one's out of pocket this money. No one is out of pocket this money at all, because as the district court record has included in our addendum, I'm quoting from it, benchmark reports that it was able to freeze and recoup the stolen funds. That's all of them. What's the addendum? The addendum is what we filed to the brief. Yeah, but that wasn't before the court, was it? It wasn't even part of the record. It was part of the district court, yes. It was before the district court? Absolutely. It's under seal in the district court, which is why we filed it, or sought to file it. And what's the source of that statement? It is a search warrant filed by Agent Kim. He is filing a search warrant for, he's asking for a search warrant from the district court. And was that put before the jury? Not before the jury. It was before the district court. What do we do with that? How was it before the district court? There was never any argument about that, was it? The district court certainly read this, I would assume, before it approved the search warrant. What I'm asking you is, did trial counsel ever raise whatever was in this other document that was not introduced into evidence? I don't believe he did. Okay. Not to my knowledge. As to Judge Niemeyer's question regarding the economic losses, I think Your Honor is hitting on an important distinction that perhaps I could have articulated. Well, I don't know if it's a distinction. I suggest that there may be distinction. The question is, I think the provision starts out to be any cost from a victim, and then it uses the word including. Now, any cost to a victim, if a victim lost money, is that a cost to the victim? And that's my question. And the statute seems to use loss and cost interchangeably, so to speak. That's what causes difficulty for me. If the whole statute was purely intended to be based on the distinction between the word loss and cost, then they would have never used the word loss. And they used the word loss, and then they defined it as cost. I would agree with my – Cost to a victim. And the question is, what is a cost to a victim? If they steal your money, is that a cost to a victim? I'd agree with opposing counsel that a loss is – you have to – the context of these statutes is very important. This is a computer fraud and abuse statute. And the reason why that's important is because economic losses are something else. They're wire fraud. He was convicted of wire fraud. They are – that's the wire fraud, those economic losses, the money the companies inadvertently paid to fraudsters. The computer fraud and abuse act – The cost is economic, too. I mean, economic just refers to money, so to speak. That's – okay, I can see that. But the point is money paid to fraudsters is wire fraud. That's a – there's a different statute that covers that, and he was convicted of that. But this – the CFAA is very specifically designed – Does that separately go into the calculation of his guidelines, setting aside the enhancement? So the guidelines operate on intended or actual loss, whichever was greater. And because the intended loss was indeed 1.2, you can use that for the guidelines. The statute, however, is only concerned with actual losses. There's no intended portion to the statute. That's, again, another important distinction. But you have to keep in mind that the CFAA – I don't remember, so I don't know, but in calculating the guidelines – not the statutory enhancement, but the guidelines – was whatever the wire fraud losses part of the calculation? The intended losses, yes. The intended losses. They were? Yes. Okay. I believe so. But, again, the CFAA is meant – it's a separate statute very specifically meant to address computer intrusions. And the way in which it arose was, you know, like a post-it council said, if you hack Amazon and Amazon is down for a day and a half, that's certainly a couple billion right there because they're not making sales. That's the sort of thing that CFAA was meant to address. And so I would point this court – if I could just read – I see I'm just about out of time. If I could just read to this court a brief excerpt from Vander High, which is a decision of this court. You can read that and then you won't get a ticket for the red light. Thank you. I appreciate that. It says that the statute contemplates, and I'm quoting here, consequential damages of the type sought, cost incurred, as part of the response to a violation. That's something that happens after the violation is discovered. So that's responding to the offense. And I'm still quoting, investigate and take remedial steps, hours of valuable time away from day-to-day responsibilities, which we had testimony about. The problem is that no one asked an amount. That's the problem with the trial testimony on that. And so I just refer this court back to Vander High. All right. Thank you for allowing me to go over. We'll come down and greet counsel and proceed on to the last case.
judges: Paul V. Niemeyer, Roger L. Gregory, G. Steven Agee